**In re Fred CLAXTON and Sarah Claxton, Debtors.**

**Bankruptcy No. 99–02397–M.**

United States Bankruptcy Court, N.D. Oklahoma.

Sept. 27, 1999.

Bruce Straub, Tulsa, OK, for debtor.

Scott Bradshaw, Tulsa, OK, for defendant.

## MEMORANDUM OPINION

TERRENCE L. MICHAEL, Chief Judge.

THIS MATTER comes before the Court pursuant to the Motion of The Exchange Bank, Skiatook, Oklahoma ("Bank") to Modify the Automatic Stay and for Trustee to Abandon Property (the "Motion") filed on July 26, 1999, and the Objection to the Motion filed by Fred Claxton and Sarah Claxton, Debtors ("Debtors" or "Claxtons"). A final hearing on the Motion was held on September 14, 1999.[1] At said hearing, the Court received evidence and heard argument from the parties. The following findings of fact and conclusions of law are made pursuant to Bankruptcy

---

1. Bank affirmatively waived its right to a hearing on the Motion within thirty (30) days of its filing as provided for under 11 U.S.C. § 362(e) (West 1999).

Rule 7052 and Federal Rule of Civil Procedure 52.

### Jurisdiction

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(b),[2] and venue is proper pursuant to 28 U.S.C. § 1409. Reference to the Court of this matter is proper pursuant to 28 U.S.C. § 157(a), and it is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(G).

### Findings of Fact

In May of 1995, Debtors obtained a loan from the Bank (the "First Loan"). Under the terms of the First Loan, Bank advanced the sum of $39,280.00 to Debtors. As security for the First Loan, Debtors executed and delivered to Bank a real estate mortgage (the "First Mortgage") encumbering certain real property located in Osage County, Oklahoma (the "Subject Property"). Paragraph 3 of the First Mortgage provides as follows:

CONVEYANCE. In consideration of the Loan and Obligations, and to secure the Obligations (which includes the Note according to its specific terms and the obligations in this Mortgage), Mortgagor hereby bargains, grants, mortgages, sells, conveys and warrants to Bank, as Mortgagee, the following described property (Property) situated in OSAGE County, OKLAHOMA, to-wit:

Tract 14, containing 5 acres; and the West 134.27 feet of Tract 15 con[sic] taining[sic] 2.71 acres, of PEACEFUL HILLS ESTATE, Osage County, Oklahoma. Containing a total of 7.71 acres, more or less. The East 20 feet of th[sic] e[sic] above described property for road and utility easement.

such property constituting the homestead of Borrower, together with all buildings, improvements, fixtures and equipment now or hereafter attached to the Property, including, but not limited to, all heating, air conditioning, ventilation, plumbing, cooling, electrical and lighting fixtures and equipment; all landscaping; all exterior and interior improvements; all easements, issues, rights, appurtenances, rents, royalties, oil and gas rights, privileges, proceeds, profits, other minerals, water, water rights, and water stock, crops, grass and timber at any time growing upon said land, including replacements and additions thereto, all of which shall be deemed to be and remain a part of the Property. All of the foregoing Property shall be collectively hereinafter referred to as the Property. To have and to hold the Property, together with the rights, privileges and appurtenances thereto belonging, unto Bank forever to secure the Obligations. Mortgagor does hereby warrant and defend the Property unto Bank forever, against any claim or claims, of all persons claiming or to claim the Property or any part thereof.

*See Bank Exhibit 1.* In April of 1998, Debtors and the Bank entered into a second loan transaction (the "Second Loan"). Under the terms of the Second Loan, Bank advanced the sum of $106,365.88 to Debtors.[3] As security for the Second Loan, Debtors executed and delivered to Bank another real estate mortgage (the "Second Mortgage") encumbering the Subject Property. Paragraph 3 of the Second Mortgage is identical to Paragraph 3 of the First Mortgage. *See Bank Exhibit 2.*

At the time it entered into the First Loan with Debtors, Bank caused the Subject Property to be appraised by Robert A. McCarley.[4] Mr. McCarley prepared a

---

**2.** Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (West 1999).

**3.** The record does not reflect whether the Second Loan constitutes a refinance of all or any part of the First Loan.

**4.** The parties stipulated that Mr. McCarley was qualified to prepare the Appraisal, and to render an expert opinion as to the fair market value of the Subject Property.

written appraisal report dated May 12, 1995, which was entered into evidence (the "Appraisal"). The Appraisal revealed that a single-family residential dwelling (the "Residence") was located on the Subject Property. In the Appraisal, Mr. McCarley concluded that the Subject Property with all improvements (including the Residence) had a fair market value of $55,000.00.[5]

A representative of the Bank testified that the Bank considered the Residence part of its collateral base for both the First and Second Loans. In response, Fred Claxton testified that while he recalled executing the documents for both the First and Second Loans, he did not specifically recall pledging the Residence as collateral for the same. He also testified that he read the First Mortgage before he signed it, and that the signatures of both he and his wife on both the First and Second Mortgages are genuine.

The Residence is best described as a "double-wide" manufactured home. It was not constructed on site at the Subject Property; instead, it was manufactured and then transported to the Subject Property. "Double-wide" manufactured homes are constructed in two separate halves. The halves, each of which were narrow enough to be transported upon a public highway, were then transported to the Subject Property, where they were joined together to form a single unit. According to the testimony of Mr. Claxton, the Residence was placed on the Subject Property in 1987 by Mr. Claxton's father-in-law, the

prior owner of the Subject Property. Upon its delivery to the Subject Property, the Residence was placed upon concrete blocks to keep it elevated above the ground. The Residence was attached to the Subject Property using four "anchors" or "tie downs." On three of its four sides, a flagstone skirting has been built to protect the undercarriage of the Residence from the elements; the fourth side is protected by a wooden skirting. Two covered porches have been constructed at the entrances to the Residence; each of the porches appear to be attached to the Residence in some fashion.[6] Trees and shrubbery have been planted immediately adjacent to the Residence. Decorative ornaments have been affixed to the exterior of the Residence. It is surrounded by a chain link fence. It is attached to water and electric utilities, and is also attached to a septic disposal system. At the present time, there are no wheels or axles on the undercarriage of the Residence.

On January 3, 1991, Sarah Ann Claxton filed an "Application for Homestead Exemption" (the "Homestead Application") with the County Assessor of Osage County, Oklahoma. In the Homestead Application, Mrs. Claxton sought a reduction in the real estate taxes on the Subject Property as result of the fact that she and Fred Claxton used the Residence as their homestead. The Homestead Application contained a detailed description of the Residence.

5. In making the appraisal, Mr. McCarley used both the "cost" and "market" approaches to valuation. Under the cost approach, an appraiser calculates the cost of acquisition of the real estate and the cost of the construction of the improvements located thereon. The appraiser then deducts from the cost of construction of the improvements an amount of depreciation based upon their age and condition. Under the market approach, the appraiser locates comparable sales of real estate and improvements and uses the same to determine the value of the subject property, making adjustments for differences between the comparable sales and the subject property. In that portion of the Appraisal devoted to the cost approach, Mr. McCarley valued

the Residence at approximately $35,192.00. All of the comparable sales used in the market approach to value included residential dwellings. It is clear that Mr. McCarley valued the Residence as part of the Subject Property.

6. Although Mr. Claxton testified that neither of the porches were attached to the Residence, the photographs of the Residence do not support his statement. Each of the porches is a covered porch. The roof of each of the porches abuts the Residence. It is obvious that each of the roofs of these porches is attached to the Residence in some fashion.

**602**

Debtors have resided in the Residence since their purchase of the Subject Property. At no time since its original delivery to the Subject Property has the Residence been moved. Fred Claxton testified to his belief that the Residence could be removed from the Subject Property with little or no damage. There is no evidence in the record to indicate that Mr. Claxton has any experience with the removal and/or transportation of "double-wide" manufactured housing.

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

### Conclusions of Law

■ The only issue presented for decision is whether the Residence constitutes a fixture upon the Subject Property.[7] If the Residence is a fixture, then it is subject to both the First Mortgage and the Second Mortgage. If the Residence is a fixture, then the Bank has a valid lien upon it which Bank is entitled to enforce. If the Residence is not a fixture, then neither of the mortgages held by the Bank attach to the Residence, and Bank is not entitled to relief from the automatic stay. In order to determine whether the Residence is a fixture, the Court looks to Oklahoma law.

■ Under the Oklahoma statutes

A thing is deemed to be affixed to the land when it is attached to it by roots, as in case of trees, lines or shrubs, or embedded in it, as in the case of walls, or permanently resting upon it, as in the case of buildings, or permanently attached to what is thus permanent, by means of cement, plaster, nails, bolts or screws.

---

7. In the Motion, Bank seeks relief from the automatic stay as to various items of personal property in addition to the Residence and the Subject Property. Debtors do not oppose the Motion except to the extent that Bank seeks to enforce the First and Second Mortgages against the Residence. Debtors' resistance to the Motion is based entirely upon the premise

Okla.Stat.Ann. tit. 60, § 7 (West 1991 & Supp.1998). The Oklahoma Supreme Court has established a three part test to be used in determining whether a particular item of property constitutes a fixture:

This court has identified three factors to consider in determining whether an item is a fixture and thus not removable: (1) The actual or constructive annexation to the realty, or something appurtenant thereto, (2) the appropriateness to the use or purpose of that part of the realty with which it is connected, and (3) the intention of the party making the annexation to make it a permanent accession to the freehold. *United Benefit Life Insurance Co. v. Norman Lumber Company*, 484 P.2d 527 (Okl.1971); *Hartford Fire Insurance Company v. Balch*, 350 P.2d 514 (Okl.1960); *Gray v. Prudential Ins. Co. of America*, 182 Okl. 342, 77 P.2d 563 (1938).

*C.I.T. Financial Services v. Premier Corporation*, 747 P.2d 934, 936 (Okla.1987) (hereafter *"CIT"*). This test has been adopted in several jurisdictions outside of Oklahoma. *See In re Onyan*, 163 B.R. 21, 25 (Bankr.N.D.N.Y.1993) (New York); *see also Sherburne Corp. v. Town of Sherburne*, 124 Vt. 481, 207 A.2d 125 (1965) (Vermont); *see also George v. Commercial Credit Corp.*, 440 F.2d 551 (7th Cir.1971) (Wisconsin). With respect to the issue of intent, "the determination as to whether the owner intended to create a fixture must be made by *objectively examining* the chattel's affixation to real property." *CIT*, 747 P.2d at 938 (emphasis added). Under § 362(g), Debtors have the burden of proof to establish that the Residence does not constitute a fixture upon the Subject Property. *See* § 362(g).[8]

---

that the Residence does not constitute a fixture. Scott P. Kirtley, the Trustee in this case, does not oppose any of the relief sought by the Bank.

8. For the record, the allocation of the burden of proof is not a factor in the decision reached today. Were the burden of proof placed upon

In the present case, the Residence has been located upon the Subject Property since 1987. It has permanent utility attachments and is attached to a septic system. It is anchored to the ground and has stone skirting on three of its four sides. Trees and shrubbery have been planted in such close proximity to the Residence as to make removal of the Residence impossible without their destruction. Two separate porches have been added to the Residence; the photographs submitted to the Court establish that they are attached to the Residence in some fashion. · The Residence is surrounded by a permanent chain link fence. Although there is no concrete foundation below the Residence, the Court finds that the Residence is "permanently resting" upon the Subject Property for purposes of Oklahoma law. *See George v. Commercial Credit Corp., supra,* 440 F.2d at 554 (mobile home set on cinder blocks, attached to real estate with "C" clamps and with utility hook-ups constituted a fixture). Accordingly, the Court finds that the first prong of the *CIT* test for determining whether the Residence is a fixture has been met. With respect to the second test, there can be little doubt that the use of the Residence a dwelling place by the Debtors is an appropriate use of both the Residence and the Subject Property.

 This Court has little difficulty in finding that the Residence was intended to be a fixture upon the Subject Property under the objective test outlined by the Oklahoma Supreme Court in *CIT.*[9] As

noted above, the location of the trees and shrubbery, the attachments of two separate porches, the use of permanent utility attachments and a permanent septic system, and the fact that it is surrounded by a fence are all indicia that the Residence was intended to be a permanent addition to the Subject Property. In addition, the nature of the Residence is not lost upon the Court. The Residence is a "double-wide" manufactured home. In its present state, it has no wheels. It has not been moved since its initial placement upon the Subject Property some twelve years ago. In order for it to be moved, the porches would have to be removed and the utilities disconnected. Thereafter, the Residence must necessarily be separated into two pieces (which would involve the removal of the stone and wood skirting as well as part of the exterior wall and roof coverings), placed upon wheels, and moved to a new location, where the process of attaching it to real estate would begin anew. As part of the moving process, most if not all of the trees and shrubbery surrounding the Residence would be damaged or destroyed. The Court concludes that when the Residence was placed upon the Subject Property, said placement was intended to be permanent. The Residence is a fixture upon the Subject Property and is properly subject to the lien of the Bank.[10]

Debtors argue that because the Residence may be easily removed from the Subject Property without damage, it does not constitute a fixture under Oklahoma

---

the Bank, the Court would reach the same decision.

9. In addition, the fact that Debtors sought on abatement of their real estate taxes by declaring the Subject Property, including the Residence, as their homestead is evidence of Debtors' *subjective* intent that the Residence was a fixture.

10. Debtors argue that the fact that neither the First Mortgage nor the Second Mortgage specifically describe the Residence is somehow evidence that the Residence is not encumbered. The Court finds no merit in this argument. A real estate mortgage serves to encumber all fixtures upon the real estate described in the mortgage. *See Basham v. Goodholm & Sparrow Inv. Co.,* 52 Okla. 536, 540, 152 P. 416, 417 (1915) (mortgage serves to encumber real estate and "the buildings and improvements erected thereon at the time, [and] all subsequent buildings, improvements and repairs thereto ..."); *see also In re Cliff's Ridge Skiing Corp.,* 123 B.R. 753, 762 (Bankr.W.D.Mich.1991) ("A mortgage covers fixtures even when they are not explicitly mentioned in the mortgage") (citation omitted). Having determined that the Residence is a fixture, there can be no conclusion other than that the Residence is subject to the Mortgages held by the Bank.

law. Debtors rely upon the decision of the United States Bankruptcy Court for the Western District of Oklahoma in *In re Tri–State Fabricators, Inc.*, 32 B.R. 260 (Bankr.W.D.Okla.1983) (hereafter *"Tri–State "*). *Tri–State* is distinguishable from the case at bar. In *Tri–State*, the property at issue was commercial in nature rather than residential. The improvements at issue were business equipment placed upon leased property by the tenant. Such items are commonly referred to as "trade fixtures." The lease at issue expressly provided that "all movable trade fixtures installed by Lessee shall be and remain the property of the Lessee." *See Tri–State*, 32 B.R. at 262. The improvements at issue in *Tri–State* were either completely unattached to the leased premises or were attached by means of "tack welds," which could be easily removed. *See id.* at 262–263. The *Tri–State* court noted that under Oklahoma law,

> a tenant may remove from the demised premises at any time during the continuance of his term anything affixed thereto for the purpose of trade, manufacture, ornament or domestic use, if the removal can be effected without injury to the premises, unless the thing has, by the manner in which it is affixed, become an integral part of the premises.

*See id.* at 262, n. 1, citing 60 O.S.1981 § 334. The *Tri–State* court, based upon this statute, as well as the fact that the items at issue were trade fixtures which could be removed from the leased premises easily and without damage, ruled that the tenant, not the landlord, was entitled to possession of the trade fixtures. The present case does not involve trade fixtures, commercial property or a landlord/tenant relationship. In addition, Oklahoma has no statute similar to the "trade fixture" statute relied upon in *Tri–State* dealing with the removal of a residential dwelling from real estate. Finally, for the reasons set forth in the preceding paragraph, the Court is not convinced that the Residence may be easily removed from the Subject Property. Debtors' reliance upon *Tri–State* is misplaced.

## Conclusion

The Motion of The Exchange Bank, Skiatook, Oklahoma to Modify the Automatic Stay and for Trustee to Abandon Property filed on July 26, 1999, is granted.

A separate judgment is entered concurrent with this Memorandum Opinion.

## *JUDGMENT*

THIS MATTER comes before the Court pursuant to the Motion of The Exchange Bank, Skiatook, Oklahoma to Modify the Automatic Stay and for Trustee to Abandon Property filed on July 26, 1999, and the Objection to the Motion filed by Fred Claxton and Sarah Claxton, Debtors. An evidentiary hearing in the matter was held on September 14, 1999. The issues having been duly considered and a decision having been duly rendered, for the reasons set forth in the Memorandum Opinion filed concurrently herewith,

IT IS HEREBY ORDERED that the Motion of the Exchange Bank, Skiatook, Oklahoma to Modify the Automatic Stay and for Trustee to Abandon Property filed on July 26, 1999, be, and the same hereby is, granted.

IT IS FURTHER ORDERED that the Exchange Bank, Skiatook, Oklahoma, is granted relief from the provisions of 11 U.S.C. § 362 with respect to the following real and personal property, to-wit:

*Real Estate:*

> Tract 14, containing 5 acres; and the West 134.27 feet of Tract 15 containing 2.71 acres of Peaceful Hills Estates, Osage County, Oklahoma. Containing a total of 7.21 acres more or less. The East 20 feet of the above-described property for roa.d[sic] and utility easement;

*Personal Property:*

> Nine (9) Bredford Heifer/Cows;
> Business equipment for Sooner Plating, plus leasehold improvements; 1–

Tube Polisher, All Office Furniture, 1 Millermatic 250 AMP Mig Welder w/Gun, 1–7″ Horizontal Grinder, 1–12 Speed Drill Press, 1–5 H.P. Air Compressor, 1–Polishing Machine & Motor, 1–Idler, 1–Duo–Fast Stapler, 1–Cutting Torch, 3 Rectifies: 1. Ser # 2471, 2. Ser# 2470, 3. Ser# 7293, 1–Air Blower, 10–Electrical Heaters w/control boxes, 12 Nickel Baskets, 1–Polishing Machine, 1–Small Air Compressor, 1–B–Blaster, 1–60' Long Air Host, 1–60'x.10'2x6 Floor Plus Blocks, plus all furniture, fixtures, inventory and equipment owned or hereafter owned or hereafter acquired and not limited to the aforementioned;·

1983 Chevrolet pickup truck (VIN: 1GCDC14H2DS140804); and

1984 Buick Riviera (VIN: 1G4AX57Y7EE456666).

IT IS FURTHER ORDERED that this Order shall operate as an abandonment by Scott P. Kirtley, Trustee herein, of the real and personal property described herein.